[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
An application for an Order of Temporary Custody was presented to the Court by the Department of Children and Families (DCF) on October 5, 2000 for Jared N. (dob 4-21-95) and Trenton H. (DOB 9-26-00). The affidavit alleged that on October 3, 2000, in response to an anonymous referral, a DCF worker went to the home of Shelbey H. and was unable to gain entry for approximately forty minutes. Upon entry, the home and Jared were found to be in disarray. Trenton was not present as he was still in the hospital after his delivery, being treated for a streptococcus B infection. Numerous allegations were contained in the affidavit CT Page 5109 suggesting that Jared was in immediate physical danger from surroundings. On the theory of predictive neglect, Trenton was also alleged to be in immediate physical danger if he went to this residence upon release from the hospital. Contemporaneously with the OTC, DCF filed a neglect petition alleging that the boys were being denied proper care and attention, physically, educationally, emotionally or morally: and/or that they were being permitted to live under conditions, circumstances or associations injurious to well-being. The Court granted the OTC as to both children on October 5, 2000. By agreement of the parties, temporary custody of Jared was transferred from DCF to Robert N., father of Jared, on October 11, 2000. Subsequently, on December 1, 2000, by agreement of the parties and upon a plea of nolo contendere by mother to the neglect petition, an adjudication of neglect was entered and guardianship and custody of Jared was transferred to Robert N. The DCF file was closed as to that child and this Court no longer had a child protection matter pending as to Jared. The court file as to Jared was concluded. By Motion filed February 7, 2001, mother seeks to open this matter to revisit issues of counseling, therapy and visitation as to Jared.
By agreement of the parties, the trial which concluded on March 13, 2001, was inclusive of the OTC and the neglect petition regarding Trenton H., the Motion to Reopen and Modify dated 2-7-01 as to Jared, and was intended to include the disposition phase as to Trenton. Testimony lasted ten days during which, together with other witnesses, two eminent psychologists, Dr. David Mantell and Dr. Ronald Anderson testified.
The Court finds, based on the information contained in the affidavit of October 5, 2000, that there was probable cause to issue the Order of Temporary Custody.
Prior to October 2, 2000, DCF had no substantiated history with Shelbey H. (mother) or her child, Jared N., whom she raised since birth almost five years ago. An accident which occurred when Jared was with his father wherein Jared pulled a television onto himself, and an accident wherein Jared, while with mother, burned himself on a vaporizer, resulted in DCF taking no action. The incident which occurred on October 3, 2000 (inability to gain access to the house) was prompted by what DCF referred to throughout as "an anonymous referral" to the DCF Careline. In fact, it was a call prompted by mother's general practitioner physician, who, at the request of DCF, supplied DCF the following day with a letter which the department attached to the Application for Order of Temporary Custody.
The facts established on trial reveal that mother had a particularly difficult pregnancy with Trenton and serious physical problems after delivery, all of which required multiple medications during and after CT Page 5110 pregnancy. Neither her OB/GYN physicians nor her general practice physicians, of whom the anonymous reporter was one, notified DCF during this pregnancy about any concerns regarding the as yet unborn child or the four year old Jared. It is not clear what prompted the call to DCF on October 2nd, but the letter attached to the OTC was obviously created after DCF had to wait about forty minutes to gain access to mother's house, and contained information which had to have been obtained from the DCF worker who was at the house. Additionally, as was brought out on cross-examination, information in the letter could not have been personally known by the reporter, but proper accreditation as to who supplied the information was lacking. The information which was known to the reporter prior to October 2nd never prompted a call to the DCF Careline or any other form of communication with DCF. Since the reporter was a mandated reporter under the statute, one must assume that the information known by the reporter prior to his conversation did not rise to the level of a mandated report. In fact, the reporter had seen mother only once during her pregnancy and had not seen her from July 28, 2000 until the day of her delivery of Trenton.
Unfortunately, DCF was unable to produce a tape recording of the original DCF Careline call of October 2nd, claiming a "malfunction", so the Court is left without the information which prompted DCF to initiate the investigation of October 3rd The DCF investigator denied DCF involvement in this case prior to the Careline referral on October 2nd, but it is clear that DCF was, in fact, involved with Trenton from September 27th. The reporter/treating physician notes, "After discussion with nursing staff, following their input from DCF we will obtain a urine drug screen, continue expectant management at this time. The baby should be watched at least another 24 hours for evidence of infection." 9-26-2000 08:08:38. Respondent's exhibit 2. DCF running narrative indicates that on September 28th the hospital social worker called the "hotline to add information to report dated 9/27/00. This report was not accepted for investigation" Respondent's exhibit 8.
It is clear to the Court from the evidence presented that the events of October 3rd were an aberration and not the norm, brought about by mother's medical condition flourishing unaddressed at that time, the fact, effects and consequences of which should have been recognized and investigated immediately and addressed by those in authority at the house that day. Mother was taken for drug testing and then brought to a hospital with Jared. The two were left together until two days later when DCF and the police came to take Jared under the OTC. It is unclear why DCF felt that Jared was safe on the nights of the 3rd and 4th, but the running notes of the department indicate that they left it up to Robert N. to decide where Jared would be staying. CT Page 5111
Although much was made by DCF of the number of medications mother was taking during and after the pregnancy and referred to by the reporter/physician as "supra normal" use, all medication she took were prescribed by a physician for a reason and known by the other physicians making up the two medical groups she used, her general practitioners and her OB/GYN group. Only the reporter/physician found the use to be "supra normal". The OB/GYN physicians were extremely careful to prescribe only what would cause no harm to the fetus while trying to assist mother as she dealt with her medical problems. The Court finds that her use of prescription drugs, while extensive, was approved by her treating physicians and did not constitute abuse of drugs.
The Court further finds that the reporter's allegation that mother never bonded with Trenton is without merit. The reporter had no way of knowing this, as he spent almost no time with Trenton. Other evidence presented indicates that mother, limited by a medical condition and lack of transportation, made all possible efforts to see her child.
The Court finds that the Department of Children and Families has failed to sustain its burden of proof by a fair preponderance of the evidence that Trenton H. would be at risk of immediate physical harm if returned to mother and the Order of Temporary Custody is dismissed.
In addition to the OTC hearing, this trial was conducted on the merits of the neglect petition filed contemporaneously with the OTC. That petition was dated October 5, 2000. DCF has the burden of proving by a fair preponderance of the evidence that Trenton was neglected as of that date, some nine days after he was born. In Re Juvenile Appeal,192 Conn. 254 (1984). To do so, the Department relies upon the recognized theory of "predictive neglect." However, in this case the only predictor would be mother's care of Jared from his birth (4-21-95) to the date of the petition. But during that time until the events of October 3, 2000, DCF had no involvement with mother other than to investigate two accidents, one while in mother's care, the result of which was that DCF took no action since no neglect was substantiated. This Court has already discussed the aberration that occurred on October 3rd and subsequent claims by the Department of prescription drug abuse. Although the Court found neglect by mother of Jared based upon her nolo contendere plea to the same and a finding that there was a factual basis to support the same, the Court does not feel that mother's parenting skills of Jared, who is ADHD, serve as a predictor of her potential parenting skills of Trenton. Dr. Ronald Anderson testified that ". . . she [mother] had a generally adequate grasp of childcare skills; that tended to take a — sort of a commonsense problem-solving approach, not terribly sophisticated, and also not — certainly having some — perhaps a somewhat restrictive repertoire of childcare skills. Although, CT Page 5112 certainly in my experience she did perhaps better than — well better than at least half of the people that I evaluate with this. Perhaps better than most." Transcript of March 9, 2001, page 14. In his report, Dr. Anderson states:
 `There is no compelling evidence that she [mother] has been irresponsible or has neglected her children in the past, though it does seem that she made some poor decisions on the morning of the unannounced DCF visit. Nevertheless, it seems that as a result of those poor decisions, she has been separated from her son and her time with him has been unaccountably restricted to nearly no contact at all. It is difficult to imagine how this restriction serves the best interests of the child, just as it is difficult to imagine how Shelbey's infant benefits from being placed out of their home." Respondent's exhibit 29, page 20.
DCF has failed to sustain its burden of proof by a fair preponderance of the evidence that mother is or would be neglectful of Trenton, and the Neglect petition is dismissed.
Finally, mother asks the Court to reopen and modify the transfer of guardianship of Jared to his father, to assure that appropriate psychological evaluations and counseling be put in place and adequate and meaningful visitation with mother occur. Section 46b-121 of the Connecticut General Statutes, states in part:
 `Juvenile matters' defined. Authority of court. (a) Juvenile matters in the civil session include all proceedings concerning uncared-for, neglected of dependent children and youth within this state, termination of parental rights of children committed to a state agency, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from Probate Court and the emancipation of minors, but does not include matters of guardianship and adoption or matters affecting property rights of any child or youth over which the Probate Court has jurisdiction, provided appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included.
When this Court transferred guardianship to father without protective CT Page 5113 supervision it concluded by that act that there were no longer any child protection issues related to Jared. What mother now claims is that because this Court entered an adjudication of neglect, it has the authority to reopen the disposition of that adjudication. Were the dispostion commitment or protective supervision, mother's position would be correct. But when the Court enters a dispostion whereby it transfers guardianship and there are no child protection issues remaining open, the Juvenile session of the Court yeilds its jurisdiction to the Family session or the Probate Court (if there is an attempt to change guardianship). Merely stating that it is in the child's best interest to reopen a disposition does not confer jurisdiction on the Juvenile session. Jurisdiction must come from the criteria set forth in CGS Sec.46b-121. Respondent mother's motion properly belongs before the Family session of the Superior Court. The Motion to Reopen and Modify dated February 7, 2001 is denied for lack of subject matter jurisdiction. This denial is not on the merits and should be given full hearing by the Family session if filed in that Court.
Mack, J.